**TRENK, DiPASQUALE,**
**DELLA FERA & SODONO, P.C.**
347 Mount Pleasant Avenue, Suite 300
West Orange, New Jersey 07052
(973) 243-8600
Richard D. Trenk
Irena M. Goldstein
Robert S. Roglieri
*Proposed Counsel for Debtor and Debtor in Possession,*
*V & V Supermarket, Inc., d/b/a Foodtown of Lake Hiawatha*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>V & V SUPERMARKET, INC., d/b/a<br>FOODTOWN OF LAKE HIAWATHA,<br><br>    Debtors. | Chapter 11<br><br>Case No. 17-15174 (___) |

**FIRST DAY DECLARATION OF VITTORIO LARACCA IN**
**SUPPORT OF CHAPTER 11 FILING AND FIRST DAY MATTERS**

VITTORIO LARACCA**,** of full age, pursuant to 18 U.S.C. § 1746, hereby certifies and declares as follows:

1.  I own one hundred (100%) percent of the outstanding shares of V. & V. Supermarket, Inc., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 bankruptcy case. I also serve as president and director of the Debtor. I am fully familiar with the business and affairs of the Debtor, including the facts and circumstances set forth herein.

2.  I submit this declaration (the "Declaration") in support of the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the relief that the Debtor has requested from the Court in various motions and applications filed contemporaneously herewith (the "First-Day Pleadings"). The relief sought in each of the

1

First-Day Pleadings (1) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption to its operations without loss of value and (2) best serves the interests of the Debtor's estates and creditors.

3. Except as otherwise indicated, the facts set forth in this Declaration are based on my personal knowledge, information supplied to me by other members of the Debtor's management or its professionals, information learned from my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. This Declaration is intended to provide a brief background of the Debtor, a description of the Debtor and its services, the reasons for the Debtor's chapter 11 filing, the Debtor's objectives in the chapter 11 process, and a summary of the relief sought in each of the First-Day Pleadings. If called as a witness in the Debtor's bankruptcy proceedings, I could and would testify competently to the facts set forth in this Declaration. Unless otherwise indicated, all financial information set forth in this Declaration is presented on an unaudited basis.

## OVERVIEW OF THE DEBTOR

4. The Debtor has operated the Foodtown in Lake Hiawatha (the "Foodtown of Lake Hiawatha"), located at 435 North Beverwyck Road, Lake Hiawatha, Morris County, New Jersey (the "Property"), continuously for the past sixteen (16) years. It acquired the Foodtown of Lake Hiawatha from C&S Wholesale Grocers, Inc. ("C&S"), which itself had acquired the store from the Grand Union bankruptcy estate. C&S is the warehouse that provides grocery products to all Foodtown Supermarkets.

5. The Debtor leases the Property from Holly Gardens, Inc. ("Holly Gardens") at approximately $15,633 per month plus property taxes. The Debtor has one (1) year remaining

2

on the Holly Gardens lease with a five (5) year option thereafter for a total of six (6) years ending in 2023. The store consists of approximately 29,000 square feet.

6. The Debtor currently employs approximately forty-five (45) employees of which approximately twelve (12) are full-time. Many of the employees earn the minimum wage of $8.44 per hour. The forty-five (45) employees consist of cashiers, department heads for the bakery, seafood, deli, produce, meat and grocery section, deli clerks, a meat wrapper and the night crew. Department heads make between $25 to $35 per hour. Deli Clerks make between approximately $9 and $16 an hour. Produce employees make approximately $13 to $14 per hour. We have a meat wrapper who makes approximately $15 an hour and two (2) night crew employees who make approximately $13 an hour.

7. The Grocery Manager is Michael Picininno, who is my nephew. Joanne Savi is Assistant Manager. Patricia Hicks is the Bookkeeper with approximately 30 years of experience.

8. The store is open seven (7) days a week, 365 days a year. The store hours are 7:00 a.m. to 10:00 p.m. Monday through Saturday and 7:00 a.m. to 9:00 p.m. on Sunday.

9. My son, Roberto Laracca is the Store Manager. Roberto and I work between sixty (60) and eighty (80) hours per week. The only day off we take is Sunday, but we often visit the store on Sundays to make sure everything is operating smoothly. My son and I live in Whippany approximately five miles from the store.

10. In addition to being open to the public seven days a week, the Debtor also provides grocery products to the Montville School District including seven (7) elementary schools and one (1) high school. These grocery items are used for home economics classes and after school programs.

11.     The store currently has revenues of approximately $200,000 to $240,000 per week or a total gross revenue of between $10 million and $12 million per year.

## THE DEBTOR'S MANAGEMENT

12.     As set forth above, I am the president, director and sole shareholder of the Debtor. I have over fifty (50) years of experience in the supermarket industry.

13.     I am currently sixty-six (66) years old. I was born in Marina di Minturno, Province of Latina, Italy and immigrated to the United States in 1960. I became a naturalized United States citizen approximately ten (10) years ago.

14.     Initially, my family lived in East Orange and then Orange. I graduated from Orange High School in 1969. After graduating from high school, I attended Newark State College, which is now known as Kean University in Union, New Jersey.

15.     I began working in the supermarket industry when I was approximately fifteen years old at the Foodtown on Day Street in Orange, New Jersey (the "Day Street Foodtown").

16.     In 1973, I began working at the Shop-Rite in North Bergen as Assistant Manager. At that time, the Shop-Rite in North Bergen was the largest Shop-Rite in New Jersey.

17.     Next, I worked for approximately five (5) years for the Foodtown Supermarkets in Livingston and Haledon as Store Manager.

18.     In 1977, I purchased the Day Street Foodtown with my brother, Vincent. The Day Street Foodtown store was owned under the name 16 N. Day Street, Inc. and was owned 50% by Vincent, and 50% by me. We sold the Day Street Foodtown in 1979.

19.     In approximately 1979, Vincent and I purchased the Foodtown at 810 North 6th Street in Newark, New Jersey (the "Newark Foodtown"). That store was owned under the name

4

V. & V. Supermarkets, Inc., which at that time was owned 50% by Vincent and 50% by me. The Newark Foodtown was sold in 2005.

20. In approximately 1986, my brother and I started pursuing business interests independently and he purchased an Acme Supermarket on Jefferson Street in Orange.

21. The Debtor's store is an integral part of the community and I am active in community organizations. I was involved in starting the Hanover Township traveling soccer program and have coached for approximately twenty-five (25) years.

22. I was formerly a member of the Italian American Club in Newark.

23. I was a member of the New Jersey Food Council and sat on the Board for approximately two (2) years.

24. I was a Vice President of Foodtown when it consisted of approximately seventy-five (75) stores consisting of fifty (50) stores in New Jersey and twenty-five (25) stores in New York. Foodtown still has approximately fifteen (15) stores in New Jersey, approximately thirty-five (35) stores in New York, and approximately five (5) stores in Pennsylvania.

25. In 2007, I pled guilty to the third degree offense theft by deception relating to improper coupon redemptions. I was sentenced to five (5) years of non-custodial probation, which I successfully completed in 2012, and I paid restitution in the amount of $346,291. The risk of future improper coupon redemptions has been eliminated by the scanning process. I am extremely remorseful and embarrassed by my conduct.

26. Other than this one offense, I have never been charged with or convicted of any other criminal activity.

## CIRCUMSTANCES LEADING TO BANKRUPTCY

A. **Other Supermarkets**

27. Substantial investments were made in two other supermarkets in Cedar Knolls and Whippany.

28. In 2004, I purchased a Foodtown in Cedar Knolls, New Jersey for $1,000,000 out of a bankruptcy proceeding. That store was purchased from Manny Foods, Inc. and owned in the name of Oliva Supermarket, LLC. ("Oliva").

29. The lease for the Cedar Knolls facility was ten (10) years and the sub-landlord was Stop & Shop.

30. Unfortunately, when the Stop & Shop sublease ended in 2014, Oliva was unable to negotiate a new lease with the landlord. As a result, Oliva was forced to vacate the Cedar Knolls premises in 2014. To the best of my knowledge, the premises remain vacant to this date.

31. In 2011, RL Market I, LLC ("RL Market"), an entity owned by my son, Roberto, bought a former Pathmark site in Whippany, New Jersey on Route 10. RL Market opened a supermarket at that location under the name Farmtastic Supermarket in 2014.

32. Approximately $2,000,000 was spent in improvements for the RL Market location. RL Market closed the store due to poor performance on October 8, 2015.

33. As set forth more fully below, the Debtor is liable for certain obligations of Oliva and RL Markets because of guarantees of those obligations.

B. **Mariner's Bank Loans and Mortgages**

34. On June 27, 2008, the Debtor and Oliva entered into a loan agreement with Mariner's Bank ("Mariner's") in the principal amount of $850,000 (the "First Mariner's Loan").

The First Mariner's Loan was used to refinance an existing $500,000 loan from Nara Bank and provide working capital to the Debtor and Oliva.

35. My wife, Josephine Laracca, and I personally guaranteed the First Mariner's Loan (the "Personal Guarantees").

36. In addition to the Personal Guarantees, the First Mariner's Loan is secured by the following collateral:

    a. A first mortgage lien on the property located at 311 Ormond Drive, Chadwick Beach, New Jersey (the "Chadwick Property");

    b. A first mortgage lien on the property located at 129 Troy Road, Parsippany New Jersey (the "129 Troy Property");

    c. A second mortgage lien on the property located at 145 Troy Road, Parsippany, New Jersey ("145 Troy Property," and collectively with the Chadwick Property and 129 Troy Property, the "Mortgaged Premises");

    d. An Absolute Assignment of Leases and Rents on the Mortgaged Premises (the "Assignment"); and

    e. A security interest in all the business assets of the Debtor and Oliva (the "Security Interest," and collectively with the Mortgaged Premises and Assignment, the "Collateral").

37. On December 17, 2012, RL Market entered into a loan agreement with Mariner's in the principal amount of $400,000 (the "Second Mariner's Loan," and collectively with the First Mariner's Loan, the "Mariner's Loans"). The Second Mariner's Loan was used to provide RL Market with money to improve the leasehold for Farmtastic and purchase inventory.

38. The Second Mariner's Loan was guaranteed by the Debtor and personally guaranteed by Josephine Laracca, Roberto Laracca, Oliva, and myself.

39. The Second Mariner's Loan is secured by the following real estate:

    f. A first mortgage lien on the 129 Troy Property;

    g. A second mortgage lien on the Chadwick Property;

  h. A third mortgage lien on the 145 Troy Property;

  i. An Absolute Assignment of Leases and Rents on the Mortgaged Premises; and

  j. A security interest in all the business assets of RL Markets.

40. The Second Mariner's Loan is not secured as to the Debtor and the Debtor's obligations under its guarantee are unsecured.

41. The remaining debt owed on the First Mariner's Loan is approximately $474,067.85. The remaining debt on the Second Mariner's Loan is approximately $330,540.61. All payments on the Mariner's Loans have been made by the Debtor apart from the February and March 2017 payments. Each payment to Mariner's Bank, in total, is approximately $11,713.50.

42. The First Mariner's Loan is substantially over collateralized. Besides the blanket lien on the Debtor's assets, Mariner's has the Personal Guarantees that are secured by the real estate collateral, which has substantial value: (i) the Chadwick Property is valued at approximately $550,000 and there are no prior mortgages; (ii) the 129 Troy Property is vacant land and is valued at approximately $400,000 there are no prior mortgages; and (iii) the 145 Troy Property, which is a private residence currently rented to a third party and valued at approximately $425,000 and is subject to a $175,000 first mortgage held by Bank of America.

### C. State of New Jersey Taxes

43. The State of New Jersey, Division of Taxation (the "Division") asserts certain monies are due with regard to delinquent State taxes and have levied. The Division has state tax liens totaling approximately $502,218.02, which have been reduced because of a garnishment.

44. Since July 1, 2015, the Division has garnished monthly rent proceeds from the Debtor's commercial tenant, Me and Him, LLC t/a Hiawatha Pharmacy (the "Pharmacy").

45. The Pharmacy rents approximately 320 square feet of area from the Foodtown of Lake Hiawatha to operate a pharmacy on the premises.

46. The Pharmacy currently pays the Division $1,750 a month as a result of the garnishment.

**D. C & S Wholesale Grocer's Inc.**

47. As of approximately August 2010, the Debtor is party to the Foodtown, Inc. Supply Agreement (the "Supply Agreement") between Foodtown, Inc. ("Foodtown") and C&S. The purpose of the Supply Agreement is for C&S to supply the Debtor, along with other members of the Foodtown cooperative, with at least ninety-five percent (95%) of the Debtor's dry groceries, candy, frozen, bakery, dairy, packaged meat, ice cream and fresh deli merchandise.

48. C&S has a blanket lien on the Debtor's assets.

49. Pursuant to the Supply Agreement, the Debtor receives 12-day credit on groceries and 21-day credit on produce from C&S.

50. The amount the Debtor owes to C&S fluctuates daily. As of the Petition Date the approximate amount due is approximately $350,000.00.

**E. Allegiance Retail Services**

51. The Debtor is part of a cooperative called Allegiance Retail Services, LLC ("Allegiance"), which provides advertising services and the use of certain company marks, service marks, tradenames and logos. The Debtor entered into the Operating Agreement of Allegiance Retail Services, LLC in November 2011.

52. The Debtor currently owes Allegiance approximately $25,000.

**F. Local Unions**

53. The Debtor is party to Collective Bargaining Agreements with United Food and Commercial Workers International Union, Local 1262 ("UFCW 1262") and United Food and Commercial Workers International Union, Local #464A ("UFCW 464A," and collectively with UFCW 464A, the "Unions"). The Debtor and UFCW 1262 are parties to a collective bargaining agreement that was entered into on or around January 17, 2016. The Debtor and UFCW 464A are parties to a collective bargaining agreement that was entered into on or around June 19, 2016.

54. The Unions assert certain monies are due under the collective bargaining agreement for benefits, including pension and health benefits.

55. UFCW 1262 has a judgment against the Debtor and Oliva in the amount of $200,887.15 and an additional judgment against the Debtor in the amount of $33,317.68 both entered by the District Court for the District of New Jersey (the "District Court") in the matter captioned <u>Trustees of the UFCW Local 1262 and Employers Pension Fund, et al. v. Oliva Supermarkets, L.L.C., et al.</u>, Civil Action No. 14-cv-3842-WJM-MF.

56. UFCW 1262 has a judgment against the Debtor and Oliva in the amount of $635,094.39 entered by the District Court in the matter captioned <u>Trustees of the UFCW Local 1262 and Employers Pension Fund v. Oliva Supermarkets, L.L.C., et al.</u>, Civil Action No. 16-cv-2875-JLL-JAD.

57. UFCW 464A has a default judgment against the Debtor in the amount of $73,250.99 entered in the District Court in the matter captioned <u>Local 464A United Food and Commercial Workers Welfare Service Benefit Fund, et al. v. V & V Supermarkets, Inc.</u>, Civil Action No. 15-cv-2734-ES-MAH.

G. **Jersey Central Power and Light**

58. One of the Debtor's alleged substantial indebtedness is to Jersey Central Power and Light ("JCP&L") in the amount of approximately $400,000. This is based apparently upon JCP&L's failure to properly meter and bill the Debtor for certain electrical usage and internal store usage from June 18, 2014 through October 13, 2016 without the Debtor's knowledge. According to JCP&L, the bills that the Debtor received and paid were for the parking lot lights only. As a result of this error, JCP&L sent a substantial bill for the electricity it had previously supplied to (but had not charged for) the Debtor. The Debtor has not been able to pay this lump sum bill. The current service is approximately $18,000 per month.

H. **Sovereign Bank**

59. On February 11, 2013, the Debtor entered into a lease (the "Equipment Lease") for a refurbished scale and scanner and a self-check out register (collectively, the "Equipment") from Sovereign Bank ("Sovereign").

60. Sovereign holds a lien on the Equipment.

61. The Debtor pays Sovereign $1,800 monthly with the balance of $18,000 remaining under the terms of the Equipment Lease. The Debtor is current on its obligations under the Equipment Lease.

I. **The Debtor's Intended Plan**

62. As part as the reorganization, the Debtor intends to seek to extend the lease for the Property with the current landlord, Holly Gardens.

63. I am confident that the debtor's operations are currently profitable and will continue to improve over the next few years. Specifically, we are committed, with the guidance and support of C&S and Foodtown, to implementing a home delivery program similar to the

Stop and Shop Peapod and other delivery and online programs. The Debtor believes that home delivery will improve sales by approximately ten (10%) percent.

64. The Debtor has other opportunities for growth. Formerly, there was a Pathmark approximately one mile away, which closed Thanksgiving 2015. As a result of the Pathmark store closing, the Debtor has gained significant business.

65. The remaining supermarket near to Foodtown of Lake Hiawatha is a Shop-Rite, which is approximately 1.5 miles away. While it is a substantially larger supermarket, the Debtor has a strong niche market with loyal clientele, particularly because the Debtor sells the highest quality fresh produce and meats.

66. I am confident that the Chapter 11 proceedings will allow the Debtor to reorganize its operations, maintain its loyal customers, and grow its sales.

## THE DEBTORS' CHAPTER 11 FILING

67. The Debtor filed a voluntary Chapter 11 petition on March 16, 2017 (the "Petition Date"). The Debtor intends to continue operating its business. The Debtor proposes to use its cash and future revenues in accordance with the debtor-in-possession operating budget, which is annexed to the cash collateral motion as Exhibit A.

## FIRST-DAY MOTIONS

68. Concurrently with the filing of its chapter 11 petition, the Debtor has filed certain motions and proposed Orders (collectively, the "First-Day Orders"). The Debtor requests this Court enter each of the First-Day Orders described below, as each is critical to the Debtor achieving a successful result in its chapter 11 case for the benefit of all parties in interest.

**A. Motion for an Order Authorizing the Interim and Final Use of Cash Collateral**

69.     The Debtor seeks entry of an order authorizing the interim and final use of Cash Collateral and submit further the the Debtor's secured creditors will not be harmed by the use of the Cash Collateral because the creditors are adequately protected by the excess equity in the value of the Debtor's business and other collateral provided.  The Cash Collateral would be used solely in accordance with the budget annexed to the Motion.  The use of Cash Collateral is necessary to ensure that the Foodtown of Lake Hiawatha continues to have groceries on its shelves so as to not lose its valuable customers during the reorganization.

**B. Debtor's Motion for an Interim Order and a Final Order (i) Prohibiting Utility Companies From Discontinuing, Altering, or Refusing Service; (ii) Deeming Utility Companies to Have Adequate Assurance of Payment; and (iii) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105(a) and 366**

70.     The Debtor seeks entry of (i) an Interim Order, and (ii) a Final Order, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (a) prohibiting the utility companies from discontinuing, altering or refusing service to the Debtors, except as set forth herein, (b) deeming the utility companies adequately assured of future performance on the basis of payment of a two-week security deposit, and (c) establishing procedures for resolving requests for additional assurance of payment.

71.     Uninterrupted utility services are essential to the Debtor's ongoing operations and, therefore, to the success of the Debtor's chapter 11 efforts.  Indeed, any disruption to the Debtor's businesses by virtue of the cessation of utility services by the utility companies will bring the Debtor's operations to a halt.

72.     In accordance with Bankruptcy Code section 366(c)(1)(A), the Debtor proposes to provide additional assurance of payment to each utility company.  Specifically, the Debtor

proposes to issue a security deposit equal to approximately two weeks estimated average utility consumption to each utility company.

### C. The Debtor's Motion for Authority to Continue to Use Existing Bank Accounts and Business Forms Pursuant to 11 U.S.C. §§ 105(a) and 363(c)

73. Currently, the Debtor has 5 bank accounts (collectively, the "Bank Accounts"). In the ordinary course of its operations, the Debtor receives deposits and issues checks, wire transfers and ACH transfers into and out of its Bank Accounts.

74. The Debtor will work closely with the banks to ensure that appropriate procedures are in place so that checks issued prior to the Petition Date, but presented after the Petition Date, will not be honored absent approval from the Court. No prepetition checks, drafts, wire transfers, or other forms of tender that have not yet cleared the relevant drawee bank as of the Petition Date will be honored unless authorized by separate Order of this Court.

75. The Debtor also seeks authority to continue to use their prepetition business forms including, but not limited to, letterhead, invoices, checks, *et cetera* (collectively, the "Business Forms"), without reference to their status as debtors-in-possession. Requiring the Debtor to immediately print new Business Forms would be burdensome, expensive, and disruptive. The Debtor will, however, either print or stamp "Debtor-in-Possession" on their checks, and when they replace stock, will obtain checks marked "Debtor-in-Possession."

### D. Debtor's Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507(a) for Authority to Maintain and Administer Pre-Petition Customer Programs, Promotions, Practices and Obligations

76. The Debtor seeks authorization to continue to honor certain existing customer programs, including a club savings card.

77. Through the motion, the Debtor seeks to continue the following programs: (1) the return and exchange policies; (2) payment of certain funds relating to New Jersey lottery tickets;

(3) its coupon program; (4) its gift certificate program; and (5) its club card program, which is run by ProLogic Consumer Marketing Services, Inc.

78. The ability to continue administering these customer programs without interruption is critical to the Debtor's valuable customer relationships and goodwill, which will inure to the benefit of the Debtor's stakeholders. If the Debtor is unable to continue the Customer Programs post-petition or honor obligations thereunder, the Debtor risks alienating certain customer constituencies.

**E. Debtor's Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 507(a)(4) and 507(a)(5): (i) Authorizing the Debtor to Pay Certain Pre-Petition Wages, Salaries, Withholding and Payroll-Related Taxes for Pre-Petition Periods; (ii) Directing All Banks to Honor Pre-Petition Checks for Payment of Pre-Petition Employee Obligations; and (iii) Authorizing the Debtor to Honor Workers' Compensation and Certain Employee Benefit Obligations**

79. The Debtor seeks authorization to (i) pay employee claims for wages, salaries, commissions, contractual compensation, sick pay, personal pay, holiday pay, other accrued compensation, withholding and payroll related taxes for the Current Pay Period (as defined therein); (ii) direct all banks to honor pre-petition checks for payment of employee obligations in the Current Pay Period; and (iii) honor workers' compensation and certain employee benefit obligations.

80. Any payments in respect of prepetition wages, salaries, commissions, and other compensation and benefit programs will not exceed the employee limitation for the Current Pay Period allowable as a priority claim under Bankruptcy Code sections 507(a)(4) and (5).

81. The Debtor believes that the payment of the employee obligations is critical in order to maintain the morale of the employees during the pendency of the chapter 11 case and to ensure that they remain with the Debtor.

**F. Motion for an Order Directing Credit Card Processors to Honor their Contracts with the Debtor Pending Assumption or Rejection Under 11 U.S.C. §§ 365 and 105(a)**

82. In the ordinary course of business, the Debtor accepts payment cards, including credit and debit cards, as payment for goods at the Debtor's store. The Debtor accepts such cards as payment in a significant number of its sales. To complete these sales, the Debtor maintains contracts under which the payments are processed with certain companies.

83. These agreements are executory contracts and the Debtor requests an order requiring such agreements to remain in full force and effect until such time as the agreements are assumed or rejected. These agreements are integral to the Debtor's ability to operate its business without interruption and maximize the value of the Debtor's estate.

I certify the foregoing statements made by me are true. I am aware if any of the foregoing statements are willfully false, I am subject to punishment.

Dated: March 16, 2017            */s/ Vittorio Laracca*
                                                        VITTORIO LARACCA

4837-7823-0084, v. 1